USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 1/03/13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

C.L. and S.B., individually and on behalf of H.L.,

Plaintiffs,

-v-

NEW YORK CITY DEPARTMENT OF EDUCATION,

Defendant.

MEMORANDUM ORDER

12 Civ. 1676 (JSR)

JED S. RAKOFF, U.S.D.J.

Plaintiffs C.L. and S.B. bring this action, individually and on behalf of their child H.L., against defendant New York City Department of Education (the "Department") for relief under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1415(i)(2). In particular, plaintiffs seek reimbursement of H.L.'s 2010-2011 tuition at the McCarton School, a private school for children with autism spectrum disorders. Having initially sought relief through the state administrative process, which terminated in the Department's favor, plaintiffs now seek review of those proceedings in this Court. Plaintiffs have moved for judgment based solely on the state administrative record. For the reasons set forth below, the Court grants plaintiffs' motion.

The IDEA requires states receiving federal education funding to provide children with disabilities a "free appropriate public education" ("FAPE"), 20 U.S.C. § 1412(a)(1)(A) -- that is, an education that provides "'special education and related

services' tailored to meet the unique needs of a particular child" that are "'reasonably calculated to enable the child to receive educational benefits.'" Frank G. v. Bd. of Educ. of Hyde Park, 459 F.3d 356, 363 (2d Cir. 2006) (quoting Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 122 (2d Cir. 1998) (quoting Bd. of Educ. v. Rowley, 458 U.S. 176, 207 (1982))).

This statutory mandate is implemented through an individualized education program ("IEP"), which is a written program of instruction that "sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." Honig v. Doe, 484 U.S. 305, 311 (1988). The IEP is developed by a "team" consisting of the child's parents, teachers, representatives of the local educational agency, and, where appropriate, the child. 20 U.S.C. § 1414(d)(1)(B). In New York, the IEP team is called the Committee on Special Education ("CSE"). N.Y. Educ. Law § 4402(1)(b)(1).

The IDEA also establishes certain procedural safeguards, including requiring states to allow parents to present complaints "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to

such child." 20 U.S.C. § 1415(b)(6)(A). New York adjudicates such complaints through a two-tiered system of administrative review. Parents wishing to challenge a proposed IEP can first seek review by an "impartial hearing officer" ("IHO"). N.Y. Educ. Law § 4404(1). Following the IHO's decision, an aggrieved party may appeal to a "state review officer" ("SRO"). N.Y. Educ. Law § 4404(2). After exhausting these administrative remedies, a party aggrieved may bring a civil action challenging the SRO decision in federal or state court. 20 U.S.C. § 1415(i)(2)(A); N.Y. Educ. Law § 4404(3).

Parents may also use this same review process to seek reimbursement for their child's tuition at a private school. Under the IDEA, parents dissatisfied with an IEP may unilaterally remove their child from public school and place the child in a private school they believe to be appropriate to their child's needs. See Forest Grove Sch. Dist. v. T.A., 557 U.S. 230, 239 (2009). However, the school district must reimburse the parents for the private school tuition only if the parents prevail under the so-called Burlington-Carter test. Under this three-part test, a parent prevails if (1) the school district fails to show that the educational program set forth in the public school's IEP was appropriate to the child's needs, (2) the parent shows that the alternative private school placement was appropriate for the child's needs, and (3) the balance of equitable factors weighs in

favor of reimbursement. R.E. v. N.Y.C. Dep't of Educ., 694 F.3d 167, 184-85 (2d Cir. 2012) (citing Florence Cnty. Sch. Dist. Four v. Carter, 510 U.S. 7 (1993); Sch. Comm. of Town of Burlington v. Dep't of Educ., 471 U.S. 359 (1985)).

The relevant facts in this case, drawn from the state administrative record, are not in dispute. H.L. is a 14-year-old child who has been diagnosed with both autism and Landau-Kleffner syndrome, a neurological disorder that affects the part of the brain controlling language and executive functioning. Findings of Fact & Dec. ("IHO Dec.") 2 & n.2. These conditions interfere with H.L's ability to speak and understand language, impair his capacity to control himself, and lead him to engage in aggressive and impulsive behavior. Tr. of Proceedings before IHO ("Tr.") 485-89.

H.L.'s conditions make it extremely difficult for him to learn and retain new information. H.L.'s standardized testing scores, including IQ tests, place him in the bottom one-tenth of one percent of test-takers. Ex. 9;[1] Tr. 524-25 His language, reading, and writing skills are at roughly a first-grade level, and his mathematics skills are at roughly a kindergarten level. He cannot use a pen or pencil, and has trouble recognizing the value of coins and currency. Ex. B-1, at 4.

---

[1] Citations in the form "Ex. _" are to exhibits from the underlying state administrative proceedings, which were filed with this Court under seal.

H.L.'s neurological problems contribute to behavioral problems that also impede his learning. In particular, when not directly engaged, H.L. is easily distracted and bored, which can lead to disruptive behaviors. Tr. 377, 489. For example, H.L. may "hit, grab, pull hair, pinch, slap on the arm or kick." Ex. B-1, at 6. In addition, in the year before the initial IHO hearing in this case, H.L. had persistently engaged in "rectal digging," in which he would pull out feces, smear them on bed sheets and walls, and, on occasion, ingest them. Tr. 493; Ex. D-2. H.L. has recently learned to avoid this behavior. Id. at 493-94.

H.L. has never attended public school. After he was diagnosed with autism in 2000, H.L. initially attended a private school approved and recommended by the Department, where he received special education in a small group setting -- specifically, a classroom with eight students, one special education teacher, and one classroom paraprofessional, or "8:1:1." The school, however, eventually found that H.L. could not function academically in a group, and therefore recommended regular 1:1 instruction using Applied Behavior Analysis ("ABA"). Tr. 487-88.

Since 2002, H.L. has attended the McCarton School. Id. McCarton's upper school, which H.L. attends, is run by Dr. Peter Gerhardt, the chairman of the Scientific Council for the

Organization for Autism. Id. at 344-46. H.L.'s current teacher is head teacher Carolyn Chiu, who is trained in ABA and holds a master's degree in special education. Id. at 430-31, 433. A certified behavioral analyst, Chigusa Halderman, also works closely with H.L. Id. at 504. At McCarton, H.L. receives a significant amount of 1:1 instruction and ABA instruction, as well as 1:1 occupational therapy five times a week and individualized speech therapy four times a week. Id. at 497.

On April 30, 2010 and May 10, 2010, the Department convened two CSE meetings to formulate an IEP for H.L. for the 2010-2011 school year. Ex. B-1, at 2-3. The attendants at the meetings included plaintiff C.L. (H.L.'s father), as well representatives from McCarton and the Department. Id. In addition, before the meetings, a certified DOE school psychologist, Kathy Kauffman, observed H.L. in the classroom at McCarton. During the observation, which lasted approximately 75 minutes, H.L. did not receive any one-on-one instruction, though he had an adult with him who assisted him while also supporting the teacher. Ex. 8; Tr. 130-32, 219-20.

During the 2009-2010 school year, H.L. participated in various group activities at McCarton on a regular basis. According to H.L.'s teacher at McCarton, H.L. could sit appropriately in a group for 30-minute intervals and generally

liked groups, especially if they involved cooking or reading. Ex. B-1, at 6; Tr. 145-46.

However, H.L.'s teachers and his father made clear at the CSE meetings that H.L. required significant 1:1 instruction in order to make progress and would not receive educational benefits if placed in a small group class. Tr. 504-06. C.L. and the representatives from McCarton thus objected when the Department proposed placing H.L. in a "6:1:1" small group class -- that is, a classroom with six students, one special education teacher, and one classroom paraprofessional.

Nevertheless, the final 2010-2011 IEP drafted by the CSE recommended that H.L. be placed in a 6:1:1 class. The IEP further recommended that this class take place in a specialized school with an additional behavior management paraprofessional assigned specifically to H.L. Exs. B-1, at 1, 26. In addition, as recommended by the McCarton staff, the IEP provided for H.L. to receive four 60-minute sessions of individual speech and language therapy, one 60-minute session of speech and language therapy in a dyad (i.e. with one other student), and five 45-minute sessions of individual occupational therapy each week. Id. at 27. The IEP also included educational goals and objectives, as well as a behavior intervention plan to help address H.L.'s disruptive behaviors. Id. at 8-24, 28.

On June 15, 2010, the Department sent plaintiffs a Final Notice of Recommendation, which identified P.S. 811 as H.L.'s proposed placement. Ex. 7; Tr. 506-07. On June 24, 2010, after receiving the notice, H.L.'s father visited P.S. 811 and met with the assistant principal, the art teacher, and Ms. Bonnie Segal, the teacher of H.L.'s proposed class. Tr. 507-08. During the visit, Segal informed C.L. that she generally provides around 15 to 20 minutes of 1:1 attention to each of her students per day. Tr. 338-39, 509.

Segal later testified that she had five students in her class, all between the ages of 11 and 13. All of the students receive occupational and speech therapy at P.S. 811, and one was assigned an individual 1:1 behavior paraprofessional. Tr. 265-67, 300. Four of Segal's students read at between second and fourth grade levels, write at between third and fifth grade levels, and follow a third grade math curriculum. Tr. 268-69, 284-88. The fifth student cannot read, writes at an early to mid-first grade level, and functions on a pre-kindergarten to kindergarten math level. Tr. 268, 284-88. By comparison, H.L. reads at an early first grade level, writes at an early first grade level, and functions on a pre-kindergarten to kindergarten math level. Ex. B-1, at 5. In addition to classroom instruction, Segal also took her students on field trips, such as

to the New York Times printing plant to interview employees. Tr. 510.

After the visit to P.S. 811, plaintiffs promptly informed the Department by letter that they would be enrolling H.L. at McCarton for the 2010-2011 school year. Ex. C-3, at 7. Plaintiffs then did enroll H.R. at McCarton, and paid the $125,000 tuition in full by December 5, 2010. Ex. D-13; Tr. 514-15. Plaintiffs requested an IHO hearing to obtain reimbursement. Ex. C-3, at 5.

After a four-day hearing, the IHO found that the Department had not offered H.L. a free appropriate public education as required by the IDEA. In particular, the IHO concluded that the proposed 6:1:1 plan was inadequate to enable H.L. to "make meaningful educational progress." IHO Dec. 4. The IHO also found that the proposed placement would have grouped H.L. with students with "significantly higher functioning levels," and that as a result H.L. "would not have benefitted from instruction in the class." Id. The IHO also found that the McCarton School was an appropriate placement for H.L., and that equitable factors favored reimbursement. Id. at 5-8.

The Department appealed the IHO's decision to the State Review Office of the New York State Education Department ("SRO"), arguing that the IHO erred in finding the state did not offer H.L. a free appropriate public education, and that equitable

considerations did not favor reimbursement. SRO Dec. 9. The SRO overturned the IHO's decision, finding that "the hearing record supports a finding that the student worked well in a group setting, and that the student would have been able to receive educational benefit and learn new skills" in the proposed 6:1:1 class. Id. at 14. The SRO further concluded that the proposed class appropriately grouped H.L. with students of similar abilities. Id. at 18. The SRO did not address whether the placement at McCarton was appropriate or whether equitable factors favored reimbursement. Id. Plaintiffs then filed this action, in effect appealing the SRO's decision to this Court.

The standard of review for a challenge of a state administrative decision under the IDEA requires this Court to "conduct[] an 'independent review of the administrative record' and then make[] a determination based on a 'preponderance of the evidence.'" W.M. v. Lakeland Cent. Sch. Dist., 783 F. Supp. 2d 497, 504 (S.D.N.Y. 2011) (quoting Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 112 (2d Cir. 2007)). While this standard is more searching than the typical review of agency action, it is nevertheless circumscribed. As the Supreme Court has explained, the duty to conduct an independent review of the record is "by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." Bd. of Educ. of Hendrick

Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 206 (1982). Accordingly, the district court in an IDEA appeal must give "due weight" to the state administrative proceedings under review, "mindful that the judiciary generally 'lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'" M.H. v. N.Y.C. Dep't of Educ. (M.H. II), 685 F.3d 217, 240 (2d Cir. 2012) (Gagliardo, 489 F.3d at 113).

The Second Circuit has recently clarified the level of deference due to state administrative decisions under the IDEA in cases where -- as here -- the SRO and the IHO disagree. See R.E., 694 F.3d at 189; M.H. II, 685 F.3d at 240-44. Although "[c]ourts generally 'defer to the final decision of the state authorities, even where the reviewing authority disagrees with the hearing officer,'" id. at 241 (quoting A.C. ex rel. M.C. v. Bd. of Educ. of Chappaqua Cent. Sch. Dist., 553 F.3d 165, 171 (2d Cir. 2009)), the Second Circuit explained that "the deference owed to an SRO's decision depends on the quality of that opinion," R.E., 694 F.3d at 189, or its "persuasiveness." M.H. II, 685 F.3d at 244 (citing Lenn v. Portland Sch. Comm., 998 F.2d 1083, 1086-87 (1st Cir. 1993)). In other words, the district court should examine the SRO's decision and determine "whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and

the witnesses than the reviewing court." Id. A district court thus "must defer to the SRO's decision on matters requiring educational expertise unless it concludes that the decision was inadequately reasoned, in which case a better-reasoned IHO opinion may be considered instead." R.E., 694 F.3d at 189.

Turning to the case at hand, under the three-step Burlington-Carter test, the Court must first determine whether the IEP recommended by the Department was appropriate to meet the H.L.'s needs. Id. at 184-85. The Supreme Court has made clear that an IEP need not be perfect, nor do school districts need to "maximize the potential" of the disabled student. Rowley, 458 U.S. at 189. Rather, school districts must simply offer "a basic floor of opportunity," id. at 200 -- in other words, they must provide a program that is "likely to produce progress, not regression." Walczak, 142 F.3d at 130. Districts thus fulfill their obligations when they comply with the IDEA's procedural requirements and formulate an IEP that is "reasonably calculated to enable the student to receive educational benefits." Rowley, 458 U.S. at 206-07. Under New York law, school districts bear the burden of demonstrating that the IEPs they develop are appropriate. N.Y. Educ. Law § 4404(1)(c); see also M.H. II, 685 F.3d at 225 n.3 (avoiding deciding whether the burden on this issue lies with the school district in a subsequent federal suit,

but noting that this question is only relevant if the evidence is in equipoise).

As in the typical IDEA case, plaintiffs here have challenged the substantive adequacy of specific programmatic elements of the IEP. In particular, plaintiffs claim that the proposed placement in P.S. 811 was inappropriate because (1) H.L. would be unable to learn new material in the proposed 6:1:1 setting as opposed to a 1:1 setting, and (2) the proposed classroom grouped H.L. with other students with unsuitably different functioning levels and individual needs. Having reviewed the parties' arguments and the administrative record as a whole, the Court agrees with plaintiffs that the Department failed to show that the proposed 6:1:1 class would enable H.L. to learn new material and therefore "receive educational benefits." Rowley, 458 U.S. at 207. Given that conclusion, the Court need not address plaintiffs' alternative argument regarding inappropriate grouping.

The hearing before the IHO included testimony from multiple witnesses on whether H.L. could progress in a 6:1:1 class. Dr. Peter Gerhardt, the director of McCarton's upper school and a national expert on adolescent autism, testified that, after working with H.L. over the course of a full school year, he had reached the unequivocal conclusion that "[t]o acquire new material, [H.L.] requires a one-on-one." Tr. 344-46,

376. Dr. Gerhardt also stated that the person teaching H.L. should have training in "Behavior Analytic Intervention," as well as, ideally, a bachelor's degree in education or a related field. Id. at 376. When asked how H.L. would fare in a 6:1:1 setting, Dr. Gerhardt testified: "I would think he would initially get very distracted . . . . [T]hen he would get bored, [and] boredom would lead to acting out behavior. I think his acquisition of new skills would drop precipitously[,] and I think it would be detrimental to his current academic experience." Id. 376-77.

Dr. Gerhardt further testified that while H.L.'s then-current curriculum included some group instruction, the group work functioned as "maintenance" time -- that is, time in which he could practice skills he had learned in individual instruction. Id. at 363. In addition, when asked about the individual behavior management paraprofessional proposed in the IEP, Dr. Gerhardt responded that a paraprofessional was not an adequate substitute for 1:1 instruction. Dr. Gerhardt explained that while the paraprofessional could impose consequences for disruptive behavior, that was not the main obstacle to H.L.'s learning. Rather, the challenge for H.L. was keeping him engaged, active, and on task, which Dr. Gerhardt believed could only be done through 1:1 instruction. Id. at 378.

Carolyn Chiu, H.L.'s then-current teacher at McCarton, also testified and agreed with Dr. Gerhardt's conclusions. Based

on her experience with H.L., she stated that he would have a "very difficult time" in a 6:1:1 because "[h]is behaviors are very interfering to his learning, and he requires a one-to-one person with him." Id. at 453. Accordingly, Chiu stated that she ensured that H.L. was taught new material in a 1:1 setting. Id.; see also Ex. D-16 (schedule showing that a majority of H.L.'s school day at McCarton consisted of 1:1 instruction).

In addition, Kathy Kauffman, the Department school psychologist, also testified on the basis of a roughly 75-minute classroom observation of H.L. at McCarton. Kauffman stated that she had observed H.L. participating in a group reading task, in which H.L. apparently "was following along and answering questions." Tr. 130-01; see also Ex. 8, at 1-2. Kauffman also testified to observing H.L. eating snacks at a table with other students, "pretty much functioning independently." Tr. 130-01; see also Ex. 8, at 1-2. Kauffman testified that she and the Department's staff concluded that H.L. could work well in a group setting, and that a 1:1 setting would be more restrictive than necessary for him. Tr. 195.

Kauffman further testified that that the proposed 6:1:1 class with an individual paraprofessional would function similarly to the classes in which she had observed H.L. at McCarton. According to Kauffman, the paraprofessional would assist the special education teacher by helping to keep H.L. on

task, "similar to what the adults in his room currently would be doing." Tr. 147.

Reversing the IHO, the SRO concluded that "the hearing record supports a finding that [H.L.] worked well in a group setting, and that the student would have been able to receive educational benefit and learn new skills" in the proposed 6:1:1 class. SRO Dec. 14. The basis for this conclusion, however, is unclear. The SRO's Decision on this issue merely states the issue, states the conclusion, summarizes the CSE meetings and the IEP, states the conclusion again, summarizes the evidence presented at the hearing, and then states the conclusion a third and final time. Id. at 12-15. At no point does the SRO actually analyze the evidence or explain the reasons for its determination.

Read charitably based on the way in which it summarizes the evidence presented in the hearing, the SRO's Decision appears to have relied on three pieces of evidence: (1) Kauffman's testimony that H.L. "worked well" in group settings, (2) Kauffman's testimony that the 6:1:1 placement with an individual paraprofessional would be similar to H.L.'s current classes, and (3) testimony and documentary evidence indicating that H.L. was capable of functioning in group classes, at least for short periods of time. But even these hypothetical grounds are insufficient to support the SRO's conclusion.

The critical problem with these pieces of evidence is that none of them rebuts the testimony of the McCarton witnesses that, based on their extensive experience with H.L., he requires 1:1 instruction to learn new skills. At best, Kauffman's testimony shows that H.L. was capable of functioning in a group class, not that he could learn in that setting. As Dr. Gerhardt explained, H.L.'s group classes at McCarton were "maintenance" time, and thus Kauffman's 75-minutes observing H.L. in group settings gave her no basis to conclude that H.L. was capable of learning in a group. Similarly, Kauffman's testimony that the proposed placement would function similarly to H.L.'s current group classes, and other evidence indicating that H.L. was capable of functioning in groups, at least for short periods of time, likewise do not indicate, much less prove by a preponderance of the evidence, that H.L. could actually learn in a 6:1:1 setting. To the extent the SRO relied on these pieces of evidence -- and they are the only remotely supportive pieces of evidence cited in the SRO's Decision -- the SRO simply missed the thrust of plaintiffs' case.

The parties have spilt considerable ink debating whether the SRO impermissibly overruled the IHO's credibility determinations. The Court finds this debate beside the point. Whether the SRO impermissibly reversed the IHO's credibility determinations (as plaintiffs claim) or merely weighed the

evidence and came to a different conclusion (as the Department claims), the critical fact remains that the SRO did not grapple with contrary evidence and gave no explanation for why it credited the unfounded assertions of a school psychologist who had observed H.L. for only an hour and a quarter over the cogent testimony of multiple highly credentialed teachers who had worked closely with H.L. for a full school year. The SRO's Decision on this issue cannot be described as "well-reasoned" or "based on substantially greater familiarity with the evidence and the witnesses than the reviewing court," M.H. II, 685 F.3d at 244, and therefore merits no deference. The Court thus turns to the IHO's decision. See R.E., 694 F.3d at 189.

In an opinion that is far better reasoned than the SRO's, the IHO found that the Department had failed to carry its burden of showing that the 6:1:1 placement would enable H.L. to make educational progress, given his "particularly intense special education needs and behavioral issues." IHO Dec. 4. The IHO based this finding on the McCarton witnesses' testimony, which the IHO found to be "credible and unrebutted." Id. The IHO acknowledged that H.L. "can work on maintaining skills in group," but concluded that "he requires 1:1 instruction to acquire new skills." Id. The IHO further concluded that "[a]lthough a behavior management paraprofessional could help control [H.L.]'s behavioral issues, the paraprofessional could

not provide the 1:1 instruction that [H.L.] would need in order to make educational progress." Id.

Based on its own independent review of the administrative record, the Court agrees with the IHO that H.L. requires 1:1 instruction to learn new skills. The Court thus concludes that the IEP was not appropriate to H.L.'s needs under the first prong of the Burlington-Carter test.

The Court thus moves to step two of the Burlington-Carter test: whether the private school placement was appropriate to the student's needs. R.E., 694 F.3d at 184-85. Although the Department initially disputed the appropriateness of the McCarton School, the IHO found it to be an appropriate placement, IHO Dec. 5-7, and the Department chose not appeal that determination, SRO Dec. 9. Accordingly, that determination is final and binding on the Department. See 34 C.F.R. § 300.514(a) ("A decision made in a hearing [like a New York IHO hearing] is final, except that any party involved in the hearing may appeal the decision . . . ."); 8 N.Y.C.R.R. § 200.5(j)(5)(v) ("The decision of the [IHO] shall be binding upon both parties unless appealed to the State review officer.").

Turning to step three of the Burlington-Carter test, the Court must determine whether equitable considerations support plaintiffs' claim for reimbursement. R.E., 694 F.3d at 184-85. The IHO determined that plaintiffs

> fully cooperated with the CSE. There is no evidence indicating that they interfered with or hindered the CSE in any way. The Student's father Parent attended CSE meetings. The Parents did not withhold consent for evaluations, assessments, or observations. The Student's father also visited the CSE's proposed placement. The Parents provided the CSE with notice of their rejection of the 6:1:1 program recommendation, and provided the CSE with appropriate and timely notice of the proposed P.811 placement.

IHO Dec. at 7 (internal citations omitted). Accordingly, the IHO concluded that "equitable factors support the Parents' tuition reimbursement claim." Id. The SRO did not review this determination on appeal, and thus the Court must give appropriate deference to the IHO's reasoning. See N.Y.C. Dep't of Educ. v. V.S., No. 10 Civ. 05120, 2011 WL 3273922, at *11 (E.D.N.Y. July 29, 2011) (holding IHO determination is due "equal deference" to SRO decisions when the SRO does not address an issue reached by the IHO) (citing Gagliardo, 489 F.3d at 113 & n.2).

The Department argues here that the IHO erred in concluding that the equities favor the reimbursement, contending that "plaintiffs never seriously considered placing [H.L.] in a public school, and would have rejected any proposed classroom that employed a 6:1+1 ratio, regardless of location." Def.'s Br. 24. The Department notes that H.L. has never attended a public school, and that plaintiffs "wind up litigating with the [Department] on an annual basis." Id. at 25 (quoting Tr. 58). The Department also points to the supposed similarity between the proposed placement and the McCarton placement as further evidence

of plaintiff's unreasonableness. In essence, the Department contends that plaintiffs' full outward cooperation in the IEP process was tainted by a bad-faith intent to enroll H.L. in McCarton in any event.

The Court cannot accept this conclusion. To begin with, the evidence the Department cites is far from sufficient to show that plaintiffs acted in bad faith. As the Supreme Court recently held, the fact that H.L. has never attended public school is no bar to reimbursement. Forest Grove, 129 S. Ct. at 2488. Nor can plaintiffs' decision to litigate their rights under the IDEA on a yearly basis prejudice their claim to relief. Moreover, contrary to the Department's contention, the proposed 6:1:1 placement was not meaningfully similar to the McCarton placement; indeed, as the Court has now ruled, the proposed placement was inappropriate to H.L.'s needs, and the McCarton placement was appropriate.

In the end, the Department cannot point to any action by plaintiffs even suggesting that their full cooperation was not completely genuine. T.P. ex rel S.P. v. Mamaroneck Union Free Sch. Dist., 554 F.3d 247, 252 (2d Cir. 2009) ("In fashioning relief, equitable considerations relating to the reasonableness of the action taken by the parents are relevant." (emphasis added) (internal quotation marks and alterations omitted)); see also 20 U.S.C. § 1412(a)(10)(C)(iii) (authorizing courts to

reduce an award under the IDEA upon "a judicial finding of unreasonableness with respect to actions taken by the parents" (emphasis added)). Indeed, the Department itself concedes that plaintiffs "ostensibly cooperated with the IEP process." Def.'s Br. 25. The Department's claim rests on mere speculation, and therefore must fail.

J.P. v. N.Y.C. Dep't of Educ., No. CV 10-3078 (ERK) (MDG), 2012 WL 359977, at *13-14 (E.D.N.Y. Feb. 2, 2012), on which the Department relies, is not to the contrary. There, the district court denied a reimbursement claim by parents who "did only the bare minimum necessary to give the appearance of their good faith participation in the process -- physically being present at the IEP and visiting the [proposed] class." Id. at *14. The student's mother in J.P. also "faile[d] to voice her view that J.P. did not belong in special education," and acted as "an observer in the process rather than an active participant." Id. This grudging participation in the IEP process stands in stark contrast to plaintiffs' full and active cooperation here.

Accordingly, the Court hereby grants plaintiffs' motion for judgment and finds that plaintiffs are entitled to be reimbursed by defendant for tuition expenses for the 2010-2011 school year. Additionally, pursuant to 20 U.S.C. § 1415(i)(3)(B)(i)(I), the Court will award reasonable attorneys' fees and costs to plaintiffs. Plaintiffs are hereby directed to

file with the Court by no later than January 18, 2013, a particularized request for reasonable attorneys' fees and costs, together with supporting documentation, that complies with 20 U.S.C. § 1415(i)(3)(C). Defendant may file any objections thereto by February 1, 2013, after which the Court will render its final judgment.

SO ORDERED.

JED S. RAKOFF, U.S.D.J.

Dated: New York, New York
January 2, 2013